LOWRY (PAUL v.). See Case No. 10,844.

## Case No. 8,583.

LOWRY v. The PORTLAND.

[1 Law Rep. 313; 1 Hunt, Mer. Mag. 255.]

District Court, D. Massachusetts. Jan. 22, 1839.

COLLISION—KEEPING TO RIGHT—DEPARTURE FROM COURSE—SPECIAL EMERGENCIES.

1. Upon collision between the steamboat Portland and the schooner Cygnet. with damage to the Cygnet, in the passage between Thatcher's Island and the Londoner, on an evening in November, the Portland *held* not to have been in fault. having taken a course in conformity to common usage, keeping to the right. and the Cygnet having departed from such usage. unnecessarily and improperly. having been previously in a course. which she had a right to keep and ought to have kept.

[Cited in The Leopard, Case No. 8.264; The Cynosure. Id. 3,528; The New Jersey. Id. 10,161; Wheeler v. The Eastern State. Id. 17,494.]

2. Special emergencies or positions of vessels may allow and even require a deviation from the general rule or usage, but the Portland not held to be blamable for not making or attempting such deviation. under the circumstances appearing in evidence.

[Cited in Poole v. The Washington, Case No. 11,271.]

3. Nautical questions proposed to experienced navigators, in reference to the case, and their answers.

[Cited in The Cynosure, Case No. 3,528.]

[In this case, the libellant [Benjamin Lowry, Jr.] claimed to recover about $600. for damages sustained by the schooner Cygnet, of 83 tons burden, in consequence of a collision with the steamer [Portland], on the night of November 17th, 1838, when passing through the passage between Thatcher's Island and the Londoner; the schooner being bound from Bangor, (Maine,) to Medford,

(Mass.,) with a cargo of lumber, and the steamer being on her way to Portland from Boston.] [1]

G. S. Hillard, for libellant.

E. Haskett Derby, for respondents.

DAVIS. District Judge. The libellant alleges, that the schooner Cygnet. of which he was and is master and part owner, was, on her passage from Bangor. in the state of Maine, on the evening of the 17th of November last, about half a mile south of the lighthouse on Thatcher's Island, near Cape Ann, forcibly struck by the steamer Portland (R. S. Boyd. commander), sailing in an opposite direction, caused by an improper change of course, as is alleged, of said steamboat, by means of which the schooner Cygnet was damaged; that the knight heads and the timbers on the star-board side of the bow were broken, the corresponding timbers, on the port side, started and rendered useless. and the deck started and ripped off as far as the windlass. It is further alleged, that the wind was light. the Cygnet moving slowly, the steamboat rapidly, and that there was room enough for the steamboat to steer clear, and pass by the schooner, without any damage whatever, and that the collision was wholly the fault of the persons navigating the steamboat Portland.

Damages are demanded to the amount of 650 dollars, viz.:

| | |
|---|---:|
| For estimated expense of the repair of the schooner, and men's clothing injured by the water | $500 |
| Schooner Tamerlane. for towing the Cygnet into Boston harbor | 50 |
| Transportation of cargo of lumber from Boston to Medford, where it was to be delivered | 100 |
| | $650 |

The Steamboat Navigation Company, owners and claimants of the Portland. in their answer, admit the collision, though not in the place specified in the libel, but deny all blame on the part of the Portland in that occurrence. alleging that the collision and incident damage to the Cygnet were occasioned by the gross carelessness, inefficiency. and mismanagement of the persons then in charge of that vessel. They aver that the schooner Cygnet was an old vessel, of inconsiderable value, and insufficiently navigated; that the steamboat Portland, strong and staunch, was. at the time stated in the libel, proceeding from Boston for Portland, in her regular employment, as a packet between those places. with many passengers, about one hundred and thirty in number, on board; that she pursued her usual course, through Broad Sound, with a four knot breeze from N. N. W., at her accustomed speed of twelve knots an hour. passing to leeward, according to invariable usage, all the numerous coasters, stated to have been more than thirty, which were met

---

[1] [From 1 Hunt, Mer. Mag. 255.]

bound to Boston, having luffed or kept to windward, averred to have been the established usage of the coast; that, about ten minutes before 5 o'clock p. m., the Portland, pursuing her direct course, was within two miles distance from Thatcher's Island lights, in a narrow channel, between Thatcher's Island and the Londoner, near which it is averred is a dangerous reef; that on entering that channel, in the usual route of the Portland for her destination, she kept well to the leeward, to give a wide berth to coasters coming from the eastward, all of which luffed and passed clear to the windward; that when the Cygnet was first discovered from the Portland, she was running a south south westerly course, through the passage, which would have carried her clear of the Portland, and to the windward; that when within half a mile, the Cygnet appeared to change her course and bear away towards the Portland, rendering it doubtful to those on board the Portland, whether it was intended to cross her bow, or pass to windward; that as soon as this deviation was noticed, five minutes, at least, before the collision, steam was shut off, pursuant to a signal given by the pilot, and the Cygnet was immediately hailed to luff; that this hail was not noticed, and was repeated four or five times, by the captain of the steamboat, with a trumpet; that, upon this, the Cygnet began to luff, and that, while hailing, the captain of the Portland, gave the signal to stop the engine entirely, and back water; that this was accordingly done, and that, as soon as the schooner began to luff, orders were given by the captain of the Portland, to the man at the wheel, to hard up the helm; that the schooner, having begun to luff, would have gone clear, although very near to the steamboat, when the captain of the Cygnet was heard, on board the steamer, to cry out, apparently in great agitation, "Hard up your helm and call all hands"; that the helm of the Cygnet was then put hard up, notwithstanding repeated and earnest calls from the steamboat to luff; that the Cygnet, being thus made to fall off, ran her starboard bow against the stem of the Portland; that when the vessels came in contact, the Portland had lost all head way, and was going, at least a knot an hour, astern; that when the collision took place, the Portland was close into the southwest end of the Londoner; that the vessels immediately separated, with no damage to the Portland, and that so moderate was the motion of the Cygnet, at the time of the collision, the injury received should be attributed, mainly, to the age and weakness of that vessel; that all due assistance was given to the Cygnet and those on board, after the occurrence; that the Portland, at the time of the collision, could not have gone further to the leeward without imminent risk of striking a dangerous reef, nor further to windward without incurring great danger of being run into by the Cygnet, thereby endangering the lives of all on board, and

property of great value. It is denied that the collision was in any way ascribable to the fault of the Portland; they aver, that her master, pilot and crew, on that occasion, used the greatest care and skill in her management, took every possible precaution to prevent the occurrence, and were, in every respect, competent to perform the duties devolving on them; and, finally, that the collision was occasioned by the recklessness, want of skill and experience of the officers and crew of the schooner Cygnet, and that the owners of the Portland are not liable for the damages sustained, stated to be greatly overrated.

The character of this case, as indicated by the libel and answer, induced a suggestion, from the court to the counsel, that it would be a relief, and obviously promotive of a correct decision, if the court could be assisted, by experienced navigators, to hear the testimony, and give their opinions on the nautical questions that might occur. The suggestion had reference to the aid occasionally given by masters of the Trinity House on trials in the high court of admiralty in England, frequently acknowledged in the reports. The intimation met with ready acceptance from the learned counsel, on both sides. Three gentlemen, selected by their agreement, and approved by the court, obligingly consented to attend the hearing, for the purposes that have been expressed; a duty somewhat irksome in a protracted examination, but which they have faithfully performed. The evidence given, at a hearing of long continuance, was contained in depositions, or derived from examination of numerous witnesses, officers, mariners or passengers in the respective vessels, and of persons, called to testify relative to usages at sea in such instances, especially on the eastern coast, and as to the amount of damage sustained. A statement of facts, of material bearing in the case, is contained in the report of the referees. After the evidence and arguments, five questions were proposed to the referees, by the court, one by the libellant's counsel, and several by the counsel for the respondent. The referees were requested to give their opinions on these questions in writing, and to express an opinion, also, on any points which might occur to them, in consideration of the evidence, which might not be comprehended in any of those questions.

The questions proposed by the court were these: (1) What are the nautical rules or usages applicable to this case, from the time when said vessels came in sight of each other until the collision which ensued? (2) If there be a general rule or usage which should govern sailing vessels under the circumstances evidenced in this case, would such rule be inapplicable to the case, from the circumstance that one of the vessels was a steamboat? (3) Was there a deviation from such rule or usage by either of these vessels; if so, was there any justifiable or reasonable

cause for such deviation? (4) If there was such deviation, by either of said vessels, on that occasion, was it induced, and rendered expedient or proper, from any reasonable ground, to infer that the other vessel had or probably would take a course, requiring or authorizing such deviation? (5) Was there any, and if any, what, blamable act or omission, at any stage of the occurrence, to which it would appear, from the evidence, that the collision is to be imputed?

On a subsequent day those gentlemen made the following report: "The under-signed have duly considered the questions submitted to them by the court, in the case of the schooner Cygnet versus the steamer Portland, and respectfully submit the following answers: To the first question they answer: That the course to be taken by vessels when approaching each other from opposite directions is not so clearly and universally understood and settled as to establish an absolute rule; but the general practice, both upon our coast and elsewhere, is that when two vessels approach each other, both having a free or fair wind, the one with her starboard tacks aboard keeps on her course, or, if any change is made, she luffs so as to pass to the windward of the other, or, in other words, each vessel passes to the right. To the second question they answer: That a steamer is always considered as sailing with a fair wind, and therefore bound to do whatever a sailing vessel, going free, (or with a fair wind,) would be required to do, under similar circumstances, in relation to any vessel she may meet. To the third question they answer: That they think there was a deviation from the common usage by those on board the schooner Cygnet, in keeping her off, when she ought to have been kept on her course, or luffed, and they are unable to discover sufficient cause for such deviation. There is some discrepancy in the testimony in this case, but not more than might be expected when the excitement of the occasion, the different position of the witnesses on board the two vessels, and other circumstances that occurred, are taken into consideration. The testimony, taken together, establishes the following facts in the case: On the evening of the 17th November last, as the schooner Cygnet was passing through the strait between Thatcher's Island, and the Londoner, steering S. S. W., with a moderate breeze from N. N. W., those on board of her discovered the steamer Portland about one point off her weather bow three or four miles distant. The schooner was then kept off about one point, and, shortly after, another point to the southward. The steamer was then steering a little to the eastward of N. N. E., thus bringing the schooner nearly ahead; and she was discovered by those on board of the steamer about three-fourths of a mile in that direction. Soon after discovering the schooner, the course of the steamer was changed to the eastward, the

necessary measures taken to diminish her speed, and, when the danger of collision became imminent, the machinery was reversed, so as nearly to stop her way before the two vessels came in contact. Had the schooner been kept on her original course, S. S. W., it is evident the collision would not have taken place, and she would have passed to windward of the steamer, as she ought to have done, especially after it was discovered that the steamer had kept off to the eastward, with the apparent design of passing to the leeward. To the fourth question they answer: That the course taken by the steamer was in conformity to what may be considered the usage in such cases, and they do not perceive that those on board the schooner had 'reasonable ground' to expect that a different course would be taken. To the fifth question they answer: That the collision was the consequence of the change of the course of the schooner, which ought not to have been made in that direction. The error, however, was unintentional, and the undersigned are fully satisfied that both parties did that which appeared to them, at the moment, likely to avoid the accident. The question put by the libellant cannot be answered unless the courses and distance of the two vessels are given; and a reply to those put by the respondents is embraced in the answers here given to the court. Benj. Rich. Wm. Sturgis. Francis Dewson."

In considering this report of the referees, I have been led to compare their results with the cases cited at the hearing, and they appear to me to correspond or to be in no conflict with those authorities. The case of The Woodrop Sims, 2 Dod. 83, was pertinently referred to by the counsel for the respondents. The brig Industry, being on a course which she had a right to keep, according to the marine usage, was run down by the Woodrop Sims, and sunk. It was holden by the court, assisted by Trinity House masters, that the Woodrop Sims was to blame; that she had the wind free, and ought to have got out of the way. So the Cygnet, though not close hauled to the wind, as the Industry was, yet, before her deviation, was in a southwesterly course, which she had a right to keep, being on the starboard tack. A steamer is properly viewed, as always having a fair wind. The Portland changed her course to the right, which would have avoided the Cygnet steering south south west, if she had continued that course. The Portland did in this case what the Woodrop Sims was considered as culpable for not doing.

The cases cited for the libellant do not appear to me to sustain the allegation that the Portland was in fault. The cases are Handaysyde v. Wilson, 3 Car. & P. 538, and The Shannon, 2 Hagg. Adm. 173. In the first mentioned case, which was before Chief Justice Best at nisi prius, there is a recognition of the principle or rule of the sea, that when a vessel is going close hauled to the wind,

and another is approaching, in an opposite direction, going free, the latter is to go to leeward; and although such vessel may go either to leeward or windward, as best she can, yet she ought, as a general rule, to suppose that the vessel going to windward will keep her position. This case, considered in reference to the principle on which it proceeds, would bind the Portland, had she met the Cygnet on her original course, to pass her either to windward or leeward, i. e. to luff or bear away, as best she could. But it sustains the course taken by the Portland, under the circumstances, as having a right to presume that the Cygnet would keep her original course. The other cases cited for the libellant was on a demand for damage done by the steamboat Shannon to a vessel called the British Union. The Shannon was coming down the English Channel, on the starboard tack. The Union was sailing up the channel. The counsel for the Shannon relied, in her defence, on the rule of navigation, upon ships meeting, and there being a doubt of their going clear, that the one on the starboard tack is to persevere in her course, the other to bear away. But the court sustained the argument of the opposite counsel, that the rule of navigation should be applied according to the character of the two vessels, and concurred in the opinion given by the Trinity House masters. Steamboats, it was holden, from their greater power, ought always to give away, and that the Shannon was farther bound to do so, as she had seen the Union four or five miles off, and was fully enabled to go clear. In the present case it was the Cygnet that bore away, after the Portland was seen by her. The change of course eastwardly, by the Portland, was taken with a discreet regard to any vessels that might be coming in an opposite direction. From that mutual diversion of course the collision ensued, and no blame can be imputed to the Portland, unless it were practicable for her to avoid that occurrence by any management, after the Cygnet was seen approaching, in a direction, that would bring the vessels in contact.

In the answer to the first question proposed to the referees, it is cautiously observed, that the rule which they mention is not absolute. There are not many rules completely absolute, and subject to no exceptions. Instances may be stated in which the general rule to be observed, by vessels approaching each other, should be disregarded; the object in view, a passage without collision, being attainable, more certainly or readily by a breach of the rule than by its observance.

There is much good sense, and, it may be presumed, a conformity to good seamanship, in the remarks made by the counsel and the court in the case before Chief Justice Best. "I apprehend," said Serjeant Jones, "the rule of the sea to be this: that the ship, which has the wind, is so to use it as to avoid the other, and is to take that course, which, under the circumstances, is the most prudent and safest course. There is no law, either of the sea or the road, by which a person is justified in adhering to a particular course, when it will be productive of mischief." "I agree," said Chief Justice Best, "with one observation, made by my Brother Jones, that although there may be a rule of the sea, yet a man who has the management of one ship is not allowed to follow that rule, to the injury of the vessel of another, when he could avoid the injury by pursuing a different course. But if the matter comes into any doubt, for instance, in the case of a dark night, then we ought to look to the practice, as that which is to regulate the parties." All this appears perfectly reasonable, and cases may occur in which the general rule that a vessel on the starboard tack should keep on her course, and steamboats keep to the right, should not be observed. Such deviations, however, from general rules or usages, obviously imply the necessity for a full and satisfactory view of all particulars, rendering such deviation urgent or eligible. At the time when those vessels entered the narrow passage, between Thatcher's Island and the Londoner, in opposite directions, the general rule should have been observed. It was observed by the Portland, bearing away to the right. The Cygnet should have kept on her course, or if any change were to be made, should have been luffed, and in either way she would have gone clear.

The views of the case taken by the referees clearly place the Cygnet in fault, for the imminent danger of collision, into which the vessels were brought, when the Cygnet was seen in near approach to the Portland; but, admitting the Cygnet to have been in fault in this particular, it would remain to be determined, whether it was in the power of the Portland, by any variation of course, to have avoided the threatened collision. It appears, from the evidence, that the Portland could not safely bear away further to the eastward, on account of the dangerous reefs on that side of the passage near the Londoner; but it remained to ascertain, whether a course might not have been taken to the left, with a fair prospect of passing in safety. That the attention of the referees might be specially directed to this point in the case, and their views obtained, the following additional questions were proposed to them: (1) Whether, in the opinion of the referees, the steamer Portland, at any time after the discovery of the Cygnet, on the evening of the 17th November last, and knowledge of her course, could have avoided collision, by being put on a course not conformable to the general rules or usages of the sea, specified in the answers to former questions on the subject? (2) Whether it was reasonable, prudent or expedient for the conductors of the Portland to have adopted, or attempted such a course? Or (3) whether what was done on board the steamer on that occasion

was the only or the best practical mode of proceeding, under the circumstances?

These questions received the following reply: "We have no doubt that a course might have been taken by the Portland after the discovery of the Cygnet that would have prevented collision; but we think the course actually taken was, under the circumstances, the proper one; and it might have reasonably been expected that the error committed on board the Cygnet, by taking an improper course, would be corrected, up to a period so near the collision, as to render it impossible to change the course of the Portland in time to avoid it; and we do not think it would have been 'reasonable, prudent, or expedient' for the conductors of the Portland to have adopted a different course at an earlier time, for, had it been attempted, and a collision ensued, we think they would have been liable for the consequences. In view of the whole case, it seems to us that the conductors of the Portland did all they ought to have done to avoid collision. In our answers to former questions, we have stated the rule or usage to be that when two vessels are approaching each other, both having the wind free, and consequently the power of readily controlling their movements, the vessel on the larboard tack shall give way, and thus each pass to the right. This rule should govern vessels, too, sailing on the wind, and approaching each other, when it is doubtful which is to windward; but if the vessel on the larboard tack is so far to windward that if both persist in their course the other will strike her on the leeward side, abaft the beam, or near the stern, in such case the vessel on the starboard tack must give way, as she can do so with greater facility, and less loss of time and distance than the other. These rules are particularly intended to govern vessels approaching each other under circumstances that prevent their course and movements being readily ascertained with accuracy—for instance, in a dark night, or dense fog. At other times, circumstances may render it expedient and proper to depart from them; for we consider them all subordinate to the rule prescribed by common sense, and applicable to all cases, under any circumstances, which is that every vessel shall keep clear of every other vessel when she has the power to do so, notwithstanding such other may have taken a course not conformable to established usage. We can scarcely imagine a case in which it would be justifiable to persist in a course, after it had become evident that a collision would ensue, if by changing such a course the collision could be avoided."

The explanations in reference to the points suggested are satisfactory, and I concur in the views expressed by the referees in this instance, as well as in the answers to preceding questions. It is a relief to receive their valuable aid in the questions occurring in the case, of ready disposal, probably, to them, from their known intelligence and experience in nautical tactics, but of a perplexing character to the court without the assistance which they have afforded. They have my thanks for the care and attention which they have bestowed in executing the duties of their appointment. They may reflect, with satisfaction, that they have not only given correct opinions for the disposal of this case, but have contributed information that may tend to prevent similar mishaps, and be a valuable auxiliary in the settlement of analogous cases, which may occur. Incidents of this description are always alarming, frequently disastrous; especially may this be apprehended when the impetus of a steam-vessel is to be encountered, from their size and velocity. By a careful observance, however, of a few rules and principles, and by vigilant attention, such occurrences may be in a great degree avoided, and steamships may proceed, with their giant power, without dismay or danger to the humblest sail vessels, that may be plodding their "weary way," in their habitual occupations.[2]

In the present instance, upon full and solicitous investigation, there appears no fault on the part of the steamer. Whatever of error or mistake there was in the occurrence, was on the other side. The libel must be dismissed, but from the favorable impression, expressed by the referees, in reference to the libellant's views and motives, and from a consideration of their circumstances, permitted to have an influence, the suit will be dismissed, without costs for the respondents, excepting that the compensation for referees is to be equally borne by the parties.

———

LOWRY (UNITED STATES v.). See Case No. 15,636.

———

[2] One of the schedules annexed to an interesting report recently made to congress by the secretary of the treasury is a list of material accidents and loss of life and property, by explosions and other disasters, which have occurred to steamboats in the United States. The whole number is 215, commencing with the Washington, on the Ohio river, in 1816. Of the above number of casualties only six were by collision. The number of lives lost by disasters in steamboats had been computed to have been 2,000, or more. "I have been able," says the secretary, "to ascertain only 1,676 killed, and 443 wounded in steamboats; and 37 killed and 98 wounded by accidents to locomotives and standing engines." The full and valuable information, given in that report, with its accompanying documents, may be expected to lead to the adoption and observance of efficient regulations, by which the danger to life and property, in the application of steam power, may be materially diminished.